# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

B.S.C. HOLDING, INC., and LYONS SALT
COMPANY,

       *Plaintiffs,*

  vs.

LEXINGTON INSURANCE COMPANY,

       *Defendant.*

Case No. 11-2252 EFM

## MEMORANDUM AND ORDER

Plaintiffs B.S.C. Holding, Inc., and Lyons Salt Company assert this action against Defendant Lexington Insurance Company seeking a declaratory judgment and damages regarding an alleged breach of an insurance contract. This case comes before the Court on Defendant's motion for summary judgment (Doc.138). For the reasons articulated below, the Court grants Defendant's motion.

## I.      Factual and Procedural Background[1]

Plaintiff Lyons Salt Company ("Lyons Salt") is a Kansas corporation that owns and operates the Lyons Salt Mine and Plant ("Lyons Mine"), which mines for salt at a depth of approximately 1,000 feet below the surface in Lyons, Kansas. Plaintiff B.S.C. Holding, Inc.

---

[1] In accordance with the procedures for summary judgment, the facts set forth herein are uncontroverted for the purposes of the motion before the Court. If controverted, the facts are related in the light most favorable to Plaintiffs as the parties opposing summary judgment.

("BSC") is a Kansas corporation and is the sole shareholder of Lyons Salt. Defendant Lexington Insurance Company ("Lexington") is an insurance company organized under the laws of the State of Delaware and has its principal place of business in Boston, Massachusetts.

**A.      The Insurance Policies**

From 2002 to 2010, Lexington issued eight consecutive policies of commercial property insurance to Plaintiffs, which named both BSC and Lyons Salt as insured parties under each policy. Plaintiffs claim that Lexington breached six of these annual policies, with the first policy beginning on May 1, 2004, and the last policy terminating on April 1, 2010 ("the Policies"). The parties stipulate that the relevant terms of each policy are identical for the purposes of this motion, and therefore, the Court shall refer to the language contained in the most recent policy, number 021437911, with a policy period of April 1, 2009 to April 1, 2010.

The Policies at issue constitute "all risk" insurance policies, which provide:

> Subject to the terms, conditions and exclusions hereafter contained, this Policy insures: 1. All real and personal property (including improvements and betterments) and contractors equipment of this Insured or similar property in the Insured's care, custody or control for which the Insured may be held liable against all risks of direct physical loss or damage occurring during the period of this policy as stated in the Schedule and/or Declarations attaching to and forming part of this policy.[2]

Under a section entitled, "Property Excluded," the Policies exclude coverage of "Water, land or land values" and "Property while Offshore or situated underground unless otherwise endorsed."[3] The Policies also contain the following under a section entitled, "Exclusions":

---

[2] Policy, Def. Ex. 6, Doc. 139-7, at 57.

[3] *Id.* at 60.

This policy does not insure against:

. . . .

5.  Loss or damage caused by or resulting from moth, vermin, termites or other insects, inherent vice, latent defect, wear, tear or gradual deterioration, contamination, rust, wet or dry rot, mold or dampness of atmosphere, smog or changes in temperature (but not including damage resulting from frozen plumbing and sprinkler system); or loss or damage by settling, shrinkage, cracking, bulging or expansion in building or foundation.

6.  Loss or damage caused by backing up of sewers or drains or seepage below ground level but this exclusion shall not apply if the loss to this policy does not exceed $25,000.00 in any one occurrence.[4]

Additionally, the Policies contain the following under a section entitled, "Conditions":

9.  Sue and Labor.  In case of an actual or imminent loss or damage, it shall be lawful and necessary for the Insured . . . to sue, labor and travel for, in and about the defense, safeguard and recovery of the property Insured hereunder . . . .  The expenses so incurred shall be borne by the Insured and the Company proportionately to the extent of their respective interests.

. . . .

12.  Suit.  No suit, action or proceeding for the recovery of any claim under this policy shall be sustainable in any court of law or equity unless the same be commenced within twelve (12) months next after discovery by the insured of the occurrence which gives rise to the claim, provided, however, that if by the law of the State within which this policy is issued such limitation is invalid, then any such claims shall be void unless commenced within the shortest limit of time permitted by the laws of such state.[5]

The Policies limited Lexington's liability to $7,500,000.00 per "occurrence," which is defined as "any one loss, disaster, casualty, or series of losses, disasters, or casualties, arising out of one event . . . ."[6]  When the last insurance policy that Lexington issued to Plaintiffs terminated on April 1, 2010, Plaintiffs then obtained coverage from a different insurer.

---

[4] *Id.* at 58-59.

[5] *Id.* at 62.

[6] *Id.* at 49.

## B.     Abnormally High Closure Rates Discovered at the Lyons Mine

Gary Petersen served as a mining consultant to Lyons Salt from 1995 to present. Petersen is not a licensed or registered engineer, but Lyons Salt relied upon his judgment with respect to designing and reviewing portions of the Lyons Mine.  On October 7, 2004, Petersen identified higher than expected closure rates, indicating that the mine floor and ceiling were coming closer together.  Petersen observed these high closure rates at the intersection of Panel 1 and Panel 2B of the Lyons Mine.

Six months later, on April 14, 2005, Petersen again identified abnormally high closure measurements in the same area.  This observation concerned Petersen, who then informed Lyons Salt that the closure rates were higher than expected and that the rates were significantly increasing.  Petersen would have expected to see closure rates around two and one-half inches per year, but his April 2005 measurements revealed closure rates of approximately twenty inches per year, nearly ten times higher than expected.

Several months later, on August 31, 2005, Petersen again identified abnormally high closure rates in the Lyons Mine.  During this inspection, Petersen was accompanied by Peter Powell, owner of the Lyons Mine.  In September 2005, Petersen advised Lyons Salt of the possibility that these abnormal closure rates could cause water to enter the Lyons Mine.  At this time, Petersen characterized water inflow as a worst case scenario that "could be a huge problem."[7]  Petersen recommended that the Lyons Mine develop a contingency plan for the possibility of water inflow.  As a result, the Lyons Mine performed backfilling in the area and began discussing the idea of building a bulkhead to prevent water inflow.

---

[7] Petersen Dep., Def. Ex. 12, Doc. 139-13, at 105.

### C.    Plaintiffs Discover Water Inflow in the Lyons Mine

On January 17, 2008, Lyons Salt personnel detected an inflow of water near Panels 1 and 2B, the same area where Petersen had repeatedly observed abnormally high closure rates. Since this time, the rate of water inflow has averaged approximately twenty-two gallons per minute, or 31,680 gallons per day. When they discovered the water intrusion, Plaintiffs were not yet certain of its specific cause, duration, or the ultimate damage it may cause.

Plaintiffs immediately identified and retained a team of mining experts and engineers to investigate the problem and to devise a solution. In July 2008, Lyons Salt attempted a method of grouting to stop or control the water inflow. Dr. Samuel Gowan, one of Plaintiffs' retained experts and a consultant for the Lyons Mine, described the method as injecting thousands of gallons of grout into rock strata above the mine, but this measure ultimately failed to stop the water inflow. By August 2009, personnel at the Lyons Mine were considering several options to resolve the problem, including additional grouting, bulkhead installation, brine injection, de-watering, and freezing.

Generally, underground water inflows can have numerous causes, benign and otherwise, and can stop as rapidly as they start. Plaintiffs considered this water inflow a problem that needed to be fixed, and Petersen was concerned about a total loss of the mine due to catastrophic flooding. In March 2009, there was a possibility of a water inflow large enough to flood the mine, and Petersen knew that a catastrophic event was going to occur at the Lyons Mine at some time in the future. Also in 2009, Dr. Gowan became concerned about a catastrophic flooding event at the Lyons Mine and conveyed that concern to Lyons Salt.

**D.    Plaintiffs' Consultants Determine the Cause of Water Inflow**

In April 2010, after more than two years of research, Plaintiffs' team of consultants concluded that an improperly sealed oil well ("the Habinger 3 well") was causing the inflow of water from a nearby aquifer, compromising the mine's structural integrity through the dissolution of the salt and deformation of the shale formations above the mine.  These experts opined that if the problem was not immediately remedied, an imminent and catastrophic inflow of water would result in the total physical loss of the mine.  In or around September 2010, Plaintiffs' consultants recommended installation of a bulkhead to seal off the water inflow, and Plaintiffs expected to complete that installation in October 2012.  The catastrophic flooding event anticipated by Plaintiffs' consultants has not yet occurred.  Dr. Gowan prepared a dissolution model predicting that a catastrophic flooding event would result in complete loss of the mine sometime in the year 2021.

After discovering the water inflow problem in 2008, Lyons Salt invested approximately $7,000,000.00 on a project to expand underground mining ("the 7X Project"), which began in January 2009 and continued until its completion in October 2010.  Much of the 7X Project consisted of installing additional equipment and utilities underground in the mine.  Powell testified that Plaintiffs would not continue to send employees underground or to place more equipment in the Lyons Mine if there was an imminent danger of flooding or collapse.  After Plaintiffs' consultants advised of the potential for a catastrophic flooding event in April 2010, Lyons Salt continued to allow its employees to work underground.  However, due to the large size of the Lyons Mine, Plaintiffs argue that there is no imminent danger to its employees because it would take several days for the mine to fill up with water and collapse in the event of catastrophic mine failure.

**E.** **Plaintiffs Notify Lexington of the Water Inflow Problem**

On July 19, 2010, Plaintiffs sent a letter and Notice of Loss to Lexington. The Notice of Loss informed Lexington for the first time that a water inflow issue was detected in January 2008, that an imminent catastrophic flooding event was going to occur at the mine, and that BSC had already spent $2,500,000.00 to investigate and remedy the water inflow problem. By this time, Panel 1 of the Lyons Mine had already closed from an original mining height of over sixteen feet to four and one-half feet. Upon receiving Plaintiffs' Notice of Loss, Lexington appointed an adjuster to investigate Plaintiffs' claim. On October 22, 2010, Lexington sent Plaintiffs a Reservation of Rights letter, which expressed Lexington's expectation that Plaintiffs minimize the loss, to take all steps necessary to protect its property, and to prevent further damage.

On December 2, 2010, Plaintiffs submitted a Proof of Loss, in which the President and C.E.O. of BSC, Judy A. Samayoa, certified that BSC discovered the alleged loss from water inflow on January 18, 2008. Samayoa testified that Plaintiffs' claim is ultimately for the loss of the entire Lyons Mine facility, though that entire loss has not yet occurred. The Proof of Loss itemized $11,508,912.00 in expenses that Plaintiffs incurred to investigate and remedy the water inflow problem. The Proof of Loss did not include any entry for the loss of the mine itself, and Samayoa never had any discussions with Plaintiffs' insurance broker about insuring the mine itself.

On May 5, 2011, Plaintiffs initiated this action, alleging breach of contract and seeking declaratory judgment. Plaintiffs claim that they have already expended $6,351,740.07 to investigate and to remedy the water inflow, and they estimate that an additional $14,129,527.52 will be required. Plaintiffs additionally seek declaratory judgment that Lexington must pay the

expenditures for the investigation, evaluation, design, and implementation of remedies for the water inflow problem. According to Plaintiffs, relief is warranted under the Policies' all-risk, sue-and-labor, and business interruption provisions.

Lexington asserts numerous independent arguments in support of its motion for summary judgment. According to Lexington, the Policies did not cover the mine itself, the sue-and-labor provision is inapplicable, and Plaintiffs' claims are precluded by the Policies' exclusions. Lexington also argues that Plaintiffs' claims are untimely under the Policies' notice conditions and contractual suit-limitation provision. Finally, Lexington asserts that Plaintiffs' claims are barred under the doctrines of fortuity, known loss, and loss-in-progress.

## II.     Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[8] "An issue of fact is 'genuine' if the evidence allows a reasonable jury to resolve the issue either way."[9] A fact is "material" when "it is essential to the proper disposition of the claim."[10] The Court views the evidence and all reasonable inferences in the light most favorable to the party opposing summary judgment.[11]

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.[12] In attempting to meet this standard, the moving party need not disprove the

---

[8] Fed. R. Civ. P. 56(a).

[9] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[10] *Id.*

[11] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[12] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

nonmoving party's claim; rather, the movant must simply point out the lack of evidence on an essential element of the nonmoving party's claim.[13]  If the moving party carries its initial burden, the party opposing summary judgment cannot rest on the pleadings but must bring forth "specific facts showing a genuine issue for trial."[14]  The opposing party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[15]  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[16]  Conclusory allegations alone are insufficient to defeat a properly supported motion for summary judgment.[17]  The nonmovant's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."[18]  Finally, summary judgment is not a "disfavored procedural shortcut," but it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[19]

### III.    Analysis

### A.  Plaintiffs' Claims are Barred By the Policies' Notice Conditions

Lexington argues that summary judgment is appropriate because Plaintiffs failed to provide timely notice after discovering structural defects and water inflow in the Lyons Mine.

---

[13] *Id.* (citing *Celotex*, 477 U.S. at 325).

[14] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[15] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[16] *Adler*, 144 F.3d at 671.

[17] *White v. York Int'l Corp.*, 45 F.3d 357, 363 (10th Cir. 1995).

[18] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[19] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

As the insurer, Lexington concedes that it bears the burden of proof with respect to its notice-of-loss defense.[20]  The issue of late notice may present questions of fact,[21] but when material facts are undisputed, the Court may determine whether an insured gave timely notice as a matter of law.[22]

The Policies at issue in this case include the following notice condition:

Notice and Settlement of Loss.  The Insured shall as soon as practicable report in writing to the Company or its agent every loss, damage, or occurrence which may give rise to a claim under this policy and shall also file with the Company or its agent within ninety (90) days from the date of discovery of such loss, damage or occurrence, a detailed sworn proof of loss.[23]

A separate condition imposed the following duties upon Plaintiffs:

DUTIES IN THE EVENT OF LOSS

You must see that the following are done in the event of "loss" to Covered Property:

2.  Give us prompt notice of the "loss."  Include a description of the property involved.

3.  As soon as possible, give us a description of how, when and where the "loss" occurred.
. . . .
4.  Take all reasonable steps to protect the Covered Property from further damage.  If feasible, set the damaged property aside and in the best possible order for examination.  Also keep a record of your expenses, for consideration in the settlement of the claim.
. . . .
6.  Permit us to inspect the property and records proving "loss."
. . . .
10.  Cooperate with us in the investigation or settlement of the claim.[24]

---

[20] Pretrial Order, Doc. 135, at 29.

[21] *Travelers Ins. Co. v. Feld Car & Truck Leasing Corp.*, 517 F. Supp. 1132, 1134 (D. Kan. 1981).

[22] *Id.*

[23] Policy, Doc. 139-7, at 61.

[24] *Id.* at 54.

To evaluate whether Plaintiffs complied with these conditions, the Court must determine (1) what type of event triggers the notice requirement, (2) whether Plaintiffs provided notice to Lexington "as soon as practicable," and (3) whether Lexington suffered prejudice as a result of late notice.

### 1. Plaintiffs' Discovery of the Water Inflow Problem Triggered the Notice Conditions on January 18, 2008.

The notice condition in this case applies to "every loss, damage, or occurrence which may give rise to a claim under this policy."[25] The Policies define the term "occurrence" as "any one loss, disaster, casualty, or series of losses, disasters, or casualties, arising out of one event . . . ."[26] However, the Policies do not define the terms "loss," "damage," "disaster," or "casualty." "The fact that an insurance policy does not define each term within it does not somehow make an undefined term ambiguous; ambiguity arises only if language at issue is subject to two or more reasonable interpretations and its proper meaning is uncertain."[27] "Courts should not strain to create an ambiguity where, in common sense, there is not one."[28] Black's Law Dictionary defines the term "loss" as "[a]n undesirable outcome of a risk; the disappearance or diminution of value, [usually] in an unexpected or relatively unpredictable way."[29] "Damage" is defined as

---

[25] *Id.* at 61.

[26] *Id.* at 49.

[27] *Newcap Ins. Co. v. Employers Reinsurance Corp.*, 295 F. Supp. 2d 1229, 1240 (D. Kan. 2003) (citing *Harmon v. Safeco Ins. Co. of Am.*, 954 P.2d 7, 11 (Kan. Ct. App. 1998)).

[28] *Id.* (citing *O'Bryan v. Columbia Ins. Group*, 56 P.3d 789, 793 (Kan. 2002)).

[29] BLACK'S LAW DICTIONARY, loss (elec. 9th ed. 2009).

"loss or injury to person or property."[30]  "Disaster" is defined as "a calamity; a catastrophic emergency."[31]  Finally, "casualty" is defined as a "thing injured, lost, or destroyed."[32]

Lexington argues that the earliest triggering occurrence involved the abnormally high closure rates that Plaintiffs discovered in October 2004 or Plaintiffs' speculation in September 2005 that the advanced closure rates could result in catastrophic flooding in the Lyons Mine. The Court disagrees.  It is clear that Plaintiffs observed abnormal closure rates and speculated about potential problems that could result.  However, the record before the Court reveals that some degree of mine closure is natural and expected.  At that time, Plaintiffs had not yet discovered any actual problem resulting from the closure rates, and perceived problems were potential and speculative.  Construing these facts in the light most favorable to the non-movants, the Court concludes that Plaintiffs lacked knowledge of any actual loss, damage, disaster, or casualty in 2004 and 2005.

On January 18, 2008, Plaintiffs discovered the water inflow problem in the very same area where they had observed abnormally high closure rates.  From this time, approximately 31,680 gallons of water have entered the Lyons Mine *each day*.  Upon this discovery, Petersen's September 2005 speculation that water inflow would be a worst case scenario that "could be a huge problem"[33] became an actual concern that catastrophic flooding would result in total loss of the Lyons Mine.  Indeed, within approximately one year, Petersen concluded that a catastrophic flooding event was going to occur at some time in the future.  Plaintiffs characterized the January

---

[30] BLACK'S LAW DICTIONARY, damage (elec. 9th ed. 2009).

[31] BLACK'S LAW DICTIONARY, disaster (elec. 9th ed. 2009).

[32] BLACK'S LAW DICTIONARY, casualty (elec. 9th ed. 2009).

[33] Petersen Dep., Doc. 139-13, at 105.

2008 discovery as a problem that needed to be fixed immediately, and they immediately retained mining experts and initiated expensive remedial measures.

These facts reflect Plaintiffs' discovery of loss, damage, disaster, or casualty on January 18, 2008. This finding comports with Plaintiffs' later characterization of the event. Both Plaintiffs' Notice of Loss and Proof of Loss identify the claimed "loss" as the water inflow discovered in January 2008. Further, in their attempt to recover under the Policies' sue-and-labor provision, Plaintiffs expressly argue that the water inflow discovered on January 18, 2008, constitutes an event of "loss or damage."[34] The Policies make no distinction between the meaning of the terms "loss" or "damage" in the notice conditions and the sue-and-labor provision. Accordingly, if an event constitutes "loss" or "damage" sufficient to invoke the Policies' sue-and-labor provision, the same event is sufficient to invoke the Policies' notice conditions.

Further, while Plaintiffs' knowledge in 2004 and 2005 was not independently sufficient to invoke their duties under the notice conditions, their cumulative observations and speculations from that period informed the knowledge that they obtained in January 2008. Plaintiffs observed abnormally high closure rates at Panels 1 and 2B and speculated about flooding as a result. When Plaintiffs discovered water inflow in the very same area, Plaintiffs correlated this problem with the high closure rates observed since 2004 and 2005. Therefore, the Court finds that Plaintiffs' discovery of water inflow also constituted Plaintiffs' discovery that the abnormally high closure rates were likely part of the same series of losses, disasters, or casualties.

---

[34] Pls. Memo. in Opp. to Def.'s Mot. for Summary J., Doc. 140, at 67.

Plaintiffs argue that the Policies' notice conditions were not triggered until April 2010, when their expert reports provided absolute knowledge of an alleged *covered* loss. According to Plaintiffs, a triggering occurrence requires the insured to know of both (1) the loss, damage, disaster, or casualty, and (2) the specific causal event giving rise to a covered claim. Therefore, Plaintiffs assert that their duty to notify Lexington did not arise until April 2010, when their experts reported the ultimate cause of the water inflow, namely, the improper construction of the Habiger 3 oil well. Plaintiffs fail to cite a single case for this proposition.

Courts in numerous jurisdictions have rejected arguments that notice obligations arise only after an insured party independently ascertains coverage or determines a specific cause of the loss. In *Sandefer Oil & Gas, Inc. v. AIG Oil Rig of Texas, Inc.*, the insured submitted notice to its insurer two years after discovering a loss.[35] The insured asserted that its delay in providing notice was excusable because it was unaware that the losses were covered under the policies.[36] The Fifth Circuit granted summary judgment in favor of the insurer, stating that "lack of knowledge of coverage and lack of knowledge that a claim could be made are not good excuses, as a matter of law, for complying with the provisions of the policy concerning notice."[37]

Similarly, in *City of Burlington v. Hartford Steam Boiler Inspection & Ins. Co.*, the insured sought coverage for costs incurred repairing leaks in a boiler.[38] Although it provided notice more than four years after discovering the leaks, the insured argued that notice was not late because it did not determine the specific cause of the leaks until several months before it

---

[35] 846 F.2d 319, 320 (5th Cir. 1988).

[36] *Id.* at 321.

[37] *Id.* at 325.

[38] 190 F. Supp. 2d 663, 667 (D. Vt. 2002).

submitted a claim.[39]  In granting summary judgment for the insurer, the court held that the insurer acted reasonably in denying coverage because "the policy requires that the insurer be given notice upon the occurrence of loss or damage that may be covered under the policy and not when the insured ultimately determines the cause of the loss or damage."[40]

Even if Plaintiffs could point to authority reaching a different conclusion, the specific language in the Policies does not accommodate Plaintiffs' restrictive interpretation.  The terms that trigger the notification conditions are listed with a disjunctive posture, such that Plaintiffs' duty to notify Lexington arose upon discovery of *either* loss, damage, disaster, *or* casualty.  Even if Plaintiffs could establish that the term "loss" carries a connotation of coverage in insurance cases, there is no indication that such a connotation is present or required in the definitions of damage, disaster, or casualty, any one of which is independently sufficient to trigger the notice conditions.

Perhaps more importantly, one cannot reasonably read the Policies to suggest that their notice conditions apply only after Plaintiffs have conducted an independent investigation and arrived at a coverage determination.  To the contrary, the notice conditions apply upon any discovery that "*may* give rise to a claim under this policy."[41]  In listing Plaintiffs' duties upon discovering a loss, the Policies provide that Plaintiffs must first promptly notify Lexington of the loss, then provide an explanation regarding how the loss occurred, and then cooperate in an investigation of the occurrence.  Obviously, notifying Lexington of a loss is both temporally and logically prior to providing a detailed explanation of that loss or conducting a cooperative

---

[39] *Id.* at 691-92.

[40] *Id.* at 692-93.

[41] Policy, Doc. 139-7, at 61 (emphasis added).

investigation to settle a claim. In fact, while arguing that the sue-and-labor provision covers the expenses incurred to prevent damage, even Plaintiffs assert that "[i]f and when Plaintiffs knew the cause of the flood or the full extent of the loss is thus irrelevant on this issue."[42]

For these reasons, the Court rejects Plaintiffs' argument that its duty to notify Lexington arose only after making determinations regarding causality and coverage. Plaintiffs' discovery on January 18, 2008, triggered the Policies' notice conditions with respect to structural and water inflow problems in the Lyons Mine.

### 2. Plaintiffs Failed to Provide Notice to Lexington "as Soon as Practicable."

The notice conditions in this case require that Plaintiffs provide notice of loss "as soon as practicable."[43] Under Kansas law, the requirement that an insured provide notice as soon as practicable requires that "the insured must notify its insurer within a reasonable period of time in view of all the relevant facts and circumstances of a particular case."[44] Because Plaintiffs' notice obligations arose on January 18, 2008, they were required to provide notice to Lexington within a reasonable time thereafter, regardless of whether they had made a conclusive determination regarding causality or coverage.

In construing the terms of an insurance policy, Kansas law requires that courts read provisions together in an attempt to give harmonious effect to the parties' intention.[45] In this case, the notice conditions contemplate notice of loss prior to submitting a detailed proof of that

---

[42] *Id.* at 68. While Plaintiffs restrict this argument to the sue-and-labor analysis, the Court finds no principled reason to distinguish the meanings of "loss" or "damage" under the notice conditions and the sue-and-labor provision.

[43] *Id.* at 61.

[44] *Atchison, Topeka & Santa Fe Ry. Co. v. Stonewall Ins. Co.*, 71 P.3d 1079, 1137 (Kan. 2003).

[45] *Am. Family Mut. Ins. Co. v. Wilkins*, 179 P.3d 1104, 1109 (Kan. 2008).

loss.  While the Policies require that Plaintiffs provide notice of loss "as soon as practicable," they require a subsequent proof of that loss "within ninety (90) days from the date of discovery of such loss, damage or occurrence . . . ."[46]  Reading these terms together, the Court finds that notice is provided "as soon as practicable" if it is made less than ninety days from the date that Plaintiffs discovered some loss, damage, or occurrence.

Here, because Plaintiffs discovered the water inflow problem on January 18, 2008, the obligation to report a loss "as soon as practicable" required Plaintiffs to notify Lexington within ninety days, on or before April 17, 2008.  It is uncontroverted, however, that Plaintiffs failed to notify Lexington of any loss or damage until July 19, 2010, more than two and one-half years later.  Plaintiffs argue that this delay was necessary for their experts to conduct an investigation. As noted above, however, Plaintiffs' notice obligations are not contingent upon their independent investigation and coverage determination.  Further, numerous courts have applied identical language to bar claims submitted less than two and one-half years after discovery.[47] Accordingly, the Court concludes that Plaintiffs failed to provide Lexington notice "as soon as practicable," as required under the Policies.

---

[46] Policy, Doc. 139-7, at 61.

[47] *United Techs. Corp. v. Am. Home Assur. Co.*, 989 F. Supp. 128, 140 (D. Conn. 1997) (granting summary judgment because notice two years after discovery was not "as soon as practicable"); *Weitz v. Lloyd's of London*, 2008 WL 7796651, *4 (S.D. Iowa 2008) (finding that notice five months after discovery was not "as soon as practicable"); *Sandifer Oil*, 846 F2d at 325 (granting summary judgment when notice was provided two years after discovery); *see Molina v. TL Dallas*, 547 F. Supp. 2d 102, 113 (D. P.R. 2008) (one year); *Hill v. Safeco Ins. Co. of Am.*, 93 F. Supp. 2d 1375, 1382 (M.D. Ga. 1999) (six months).

### 3. Lexington Suffered Prejudice as a Result of Plaintiffs' Delay

In addition to proving that Plaintiffs' notice was untimely, Kansas law requires Lexington to demonstrate actual prejudice as a result of the delay.[48] "Generally, whether an insurer has been prejudiced from the failure to provide timely notice is a question of fact, but where the relevant facts are not in dispute it may be determined as a matter of law."[49] "[I]n determining whether insurers have been prejudiced by a delay in giving notice, the court must consider the extent to which the purpose of the provision has been defeated, or to which the insurance company has been placed in a substantially less favorable position than it would have been had timely notice been provided."[50] "The primary underlying purpose of a notice requirement is to allow the insurer to assess and control the risk, and the failure of the insured to provide notice severely undercuts this purpose."[51]

Lexington's corporate representative, Ossian Cooney, testified that Lexington suffered prejudice for several independent reasons. First, Cooney testified that Lexington had difficulty obtaining accurate reports and information from witnesses because they lacked clear memory of events that had occurred more than two years earlier. Second, Cooney testified that when

---

[48] *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Fed. Deposit Ins. Corp.*, 957 P.2d 357, 367 (Kan. 1998); *Cessna Aircraft Co. v. Hartford Accident & Indem. Co.*, 900 F. Supp. 1489, 1515 (D. Kan. 1995).

[49] *Newcap Ins. Co. v. Employers Reinsurance Corp.*, 295 F. Supp. 2d 1229, 1241 (D. Kan. 2003) (citing *Home Life Ins. Co. v. Clay*, 719 P.2d 756, 761-72 (Kan. Ct. App. 1986)).

[50] 13 LEE R. RUSS, COUCH ON INS. § 193:68 (3d ed. 2012) (citing *TPLC, Inc. v. United Nat. Ins. Co.*, 44 F.3d 1484 (10th Cir. 1995)); *Phico Ins. Co. v. Providers Ins. Co.*, 888 F.2d 663, 668 (10th Cir. 1989) ("The purpose of a policy provision such as that here involved requiring that the insured give the insurer prompt written notice of an occurrence or claim is to provide the insurer an opportunity to make a timely and adequate investigation in order to form an intelligent estimate of its rights and liabilities.").

[51] *Id.*; *see Travelers*, 517 F. Supp. at 1135 ("The fundamental purpose for requiring an insurance company to receive early notice of an occurrence which may possibly give rise to a claim is that prompt notice will afford the carrier an opportunity to investigate the occurrence and thereafter properly dispose of any claim through settlement or defense of the claim.").

Lexington received notice of any structural or water inflow problems, the conditions at the mine had significantly changed due to the abnormally high closure rates. Third, Cooney testified that Lexington was deprived of an opportunity to inspect the mine or to evaluate and approve the remedies that Plaintiffs implemented.

Plaintiffs argue that the proposed prejudice was hypothetical instead of actual because Cooney testified that the delay "may" have inhibited Lexington's ability to obtain information from witnesses. Cooney testified that "[i]t *was* more difficult for us to get any kind of information from people. Their memories *were* not as fresh."[52] Cooney also testified that "[c]ertainly our ability to investigate and question witnesses *was* affected . . . ."[53] However, Cooney stated that witnesses "*may* not recall events that happened more than two years before," and that this circumstance "*may* have affected our ability to get additional information."[54] Counsel for Plaintiffs asked Cooney whether his use of the word "may" indicated that he did not know whether the delay in reporting actually affected Lexington's ability to obtain additional information from witnesses. Cooney responded, "[h]ow could I know?"[55]

Plaintiffs argue that this testimony unilaterally defeats Lexington's claim of actual prejudice. However, to the extent that Cooney's use of the word "may" tempers his testimony with respect to prejudice in obtaining information from witnesses, it does not inhibit his testimony regarding his other claims of prejudice. More importantly, Plaintiffs' position ignores the testimony immediately following Cooney's response:

---

[52] *Id.* (emphasis added).

[53] *Id.* (emphasis added).

[54] Cooney Dep., Doc. 139-8, at 127.

[55] *Id.*

Q.   So can you identify any actual prejudice or impairment which Lexington has, in fact, sustained?

A.   We didn't have a chance to inspect the mine before the remediation measures were taken.

Q.   Which remediation measures?

A.   My recollection is there were significant costs incurred for grouting. A significant amount of closure in the area in question had occurred between 2008 and 2010 which affected our ability to investigate the situation before that closure occurred.[56]

After Plaintiffs' counsel had questioned Cooney's use of the word "may" and directly requested examples of actual prejudice, Cooney unambiguously reiterated that conditions in the mine had significantly changed and that Lexington was deprived of an opportunity to inspect, investigate, approve, or participate in the remedies that Plaintiffs implemented.

The uncontroverted facts in this case reveal that Lexington suffered prejudice as a result of Plaintiffs' delay in reporting the loss. On July 19, 2010, Lexington did not merely receive notice of a loss. Instead, Lexington learned for the very first time that Plaintiffs had observed structural problems since 2004, with speculation that such closure could cause water in the mine. Lexington also learned that two and one-half years earlier, Plaintiffs discovered water inflow in the same area where they had observed structural problems, and that this water inflow threatened catastrophic loss of the entire mine. Lexington also learned that Plaintiffs unilaterally engaged consultants and geotechnical experts who had already spent years completing an independent investigation. Finally, Lexington was informed that BSC had already expended more than $2,500,000.00 to perform various remedial measures, and that additional expenses were coming.

---

[56] *Id.*

Powell, the owner of Lyons Salt, testified that Plaintiffs undertook significant remedial measures before Lexington knew of any structural or water inflow problems, such that Lexington never had the opportunity to inspect, examine, or participate in remedial measures. Additionally, because Panel 1 of the Lyons Mine had closed from sixteen and one-half feet to four and one-half feet, Cooney testified that this change actually affected Lexington's ability to investigate the loss. Simply put, when any loss or damage *may* give rise to a claim for Lexington to pay, the Policies entitled Lexington to investigate the claimed damage and to cooperate in settling the claim. Plaintiffs' failure to provide timely notice deprived Lexington of the benefit of its bargain, leaving Lexington to pick up the tab for damage that Plaintiffs had long observed, an investigation that Plaintiffs unilaterally completed, and substantial remedial measures that Plaintiffs had already implemented. The Court therefore holds that Lexington suffered prejudice as a result of Plaintiffs' failure to provide timely notice.

### B. Remaining Bases for Summary Judgment

Because the Court finds that Plaintiffs' claims are barred by the Policies' notice conditions, the Court does not reach whether Plaintiffs' claims are similarly barred under the Policies' one-year contractual suit-limitation provision or the doctrines of fortuity, known loss, or loss in progress. Likewise, the Court does not reach Defendants' arguments concerning specific exclusions under the Policies.

**IT IS ACCORDINGLY ORDERED** this 22nd day of May, 2013, that Defendant's Motion for Summary Judgment (Doc. 138) is hereby **GRANTED**.

**IT IS SO ORDERED**.


ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE