# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| B.S.C. HOLDING, INC., and LYONS SALT COMPANY, | |
| *Plaintiffs,* | |
| vs. | Case No. 11-CV-2252 |
| LEXINGTON INSURANCE COMPANY, | |
| *Defendant.* | |

## MEMORANDUM AND ORDER

Plaintiffs B.S.C. Holding, Inc., and Lyons Salt Company filed this suit against Defendant Lexington Insurance Company seeking a declaratory judgment and damages for breach of an insurance contract. The Court previously granted Defendant's Motion for Summary Judgment on the basis that Plaintiffs failed to provide timely notice as required by the contract, and Plaintiffs appealed. The Tenth Circuit reversed the Court's decision and remanded with instructions to vacate the summary judgment award. Before the Court is Defendant's Motion for Ruling on Its Remaining Summary Judgment Bases (Doc. 170). Because Defendant's remaining summary judgment bases were not considered by the Court in its summary judgment Order, the Court grants Defendant's motion and addresses two of Defendant's summary judgment bases below.

# I.     Factual and Procedural Background[1]

## A.     The Insurance Policies

Plaintiff Lyons Salt Company ("Lyons Salt") operates a salt mine in Lyons, Kansas. Plaintiff B.S.C. Holding, Inc. ("BSC"), is the sole shareholder of Lyons Salt. From 2002 to 2010, Defendant Lexington Insurance Company issued eight consecutive policies of commercial property insurance to Plaintiffs, which named both Lyons Salt and BSC as insured parties under each policy. Plaintiffs claim that Defendant breached six of these policies, with the first policy beginning on May 1, 2004, and the last policy terminating on April 1, 2010 (the "Policies").[2]

The Policies at issue constitute "all risk" insurance policies, which provide:

> Subject to the terms, conditions and exclusions hereafter contained, this Policy insures: 1. All real and personal property (including improvements and betterments) and contractors equipment of this Insured or similar property in the Insured's care, custody or control for which the Insured may be held liable against all risks of direct physical loss or damage occurring during the period of this policy as stated in the Schedule and/or Declarations attaching to and forming part of this policy.[3]

Under a section entitled, "Property Excluded," the Policies exclude coverage of "Water, land or land values" and "Property while Offshore or situated underground unless otherwise endorsed."[4]

The Policies also contain the following under a section entitled, "Exclusions":

---

[1]     Because the Court will address Defendant's summary judgment motion, the Court has set forth the uncontroverted facts, and they are related in the light most favorable to the non-moving party in accordance with summary judgment procedures.

[2]     The parties stipulate that the relevant terms of the Policies are identical for purposes of Defendant's summary judgment motion, and therefore, the Court will refer to the language contained in the most recent policy, number 021437911, with a policy period of April 1, 2009, to April 1, 2010.

[3]     Policy, Doc. 139-7, p. 57.

[4]      Policy, Doc. 139-7, p. 60.

This policy does not insure against:

. . . .

5.  Loss or damage caused by or resulting from moth, vermin, termites or other insects, inherent vice, latent defect, wear, tear or gradual deterioration, contamination, rust, wet or dry rot, mold or dampness of atmosphere, smog or changes in temperature (but not including damage resulting from frozen plumbing and sprinkler system); or loss or damage by settling, shrinkage, cracking, bulging or expansion in building or foundation.

6.  Loss or damage caused by backing up of sewers or drains or seepage below ground level but this exclusion shall not apply if the loss to this policy does not exceed $25,000.00 in any one occurrence.[5]

Additionally, the Policies contain the following under a section entitled, "Conditions":

9.  Sue and Labor.  In case of an actual or imminent loss or damage, it shall be lawful and necessary for the Insured . . . to sue, labor and travel for, in and about the defense, safeguard and recovery of the property Insured hereunder . . . .  The expenses so incurred shall be borne by the Insured and the Company proportionately to the extent of their respective interests.

. . . .

12.  Suit.  No suit, action or proceeding for the recovery of any claim under this policy shall be sustainable in any court of law or equity unless the same be commenced within twelve (12) months next after discovery by the insured of the occurrence which gives rise to the claim, provided, however, that if by the law of the State within which this policy is issued such limitation is invalid, then any such claims shall be void unless commenced within the shortest limit of time permitted by the laws of such state.[6]

The Policies limited Defendant's liability to $7,500,000.00 per "occurrence," which is defined as "any one loss, disaster, casualty, or series of losses, disasters, or casualties, arising out of one event . . . ."[7]  The last insurance policy that Defendant issued to Plaintiffs terminated on April 1, 2010.  Plaintiffs then obtained coverage from a different insurer.

---

[5]     Policy, Doc. 139-7, p. 58-59.

[6]     Policy, Doc. 139-7, p. 62.

[7]     Policy, Doc. 139-7, p. 49.

## B. High Closure Rates and Water Inflow Discovered at the Lyons Mine

In October 2004, Plaintiffs discovered higher than expected closure rates at the intersection of Panel 1 and Panel 2B of the Lyons Mine. The "higher than expected" closure rates pertained to the rate that the mine floor and the mine ceiling in Panel 1 and Panel 2B were coming closer together. Plaintiffs observed these abnormally high closure rates again in April and August of 2005, and in September 2005, a consultant to the Lyons Mine, Gary Petersen, advised Lyons Salt of the possibility of water entering the mine. Petersen characterized the water inflow as a worst-case scenario that "could be a huge problem."[8]

On January 17, 2008, Lyons Salt detected an inflow of water near the same area where Plaintiffs previously observed the abnormally high closure rates. Since this time, the rate of water inflow has averaged approximately twenty-two gallons per minute, or 31,680 gallons per day. Plaintiffs were not aware of the cause of the water inflow when they discovered the intrusion.

After discovering the water inflow, Plaintiffs immediately retained a team of mining experts and engineers to investigate and devise a solution. Plaintiffs considered the water inflow a problem that needed to be fixed, and Petersen was concerned about a total loss of the mine due to catastrophic flooding. In March 2009, there was a possibility that the inflow could be large enough to flood the mine, and Petersen predicted that a catastrophic event was going to occur at the Lyons Mine at some time in the future. Also in 2009 one of Plaintiffs' retained experts and consultants became concerned about a catastrophic flooding event at the Lyons Mine and conveyed that concern to Lyons Salt.

---

[8] Petersen Dep., Doc. 139-13, p. 105.

In April 2010, Plaintiffs' team of consultants concluded that an improperly sealed oil well ("the Habinger 3 well") was causing the inflow of water from a nearby aquifer, compromising the mine's structural integrity. Plaintiffs' consultants opined that if the problem was not immediately remedied, an imminent and catastrophic inflow of water would result in total physical loss of the mine. Plaintiffs' consultants recommended installation of a bulkhead to seal off the water inflow, and Plaintiffs expected to complete that installation in October 2012. The catastrophic flooding event anticipated by Plaintiffs' consultants has not yet occurred.

### C.       Plaintiffs Notify Defendant of the Water Problem and Initiate this Suit

On July 19, 2010, Plaintiffs sent a letter and Notice of Loss to Defendant. The Notice of Loss informed Defendant for the first time that a water inflow issue was detected in January 2008, that an imminent catastrophic flooding event was going to occur at the mine, and that BSC had already spent $2,500,000.00 to investigate and remedy the water inflow problem. Upon receiving the Notice of Loss, Defendant appointed an adjuster to investigate Plaintiffs' claim. On October 22, 2010, Defendant sent Plaintiffs a Reservation of Rights Letter, stating that it expected Plaintiffs to minimize the loss, take all steps necessary to protect its property, and prevent further damage.

On December 2, 2010, Plaintiffs submitted a Proof of Loss, in which BSC's President and CEO certified that BSC discovered the alleged loss from water inflow on January 18, 2008. The Proof of Loss itemized $11,508,912.00 in expenses that Plaintiffs incurred to investigate and remedy the water inflow problem. The Proof of Loss did not include any entry for the loss of the mine itself, and BSC never had any discussions with Plaintiffs' insurance broker about insuring the mine itself.

Plaintiffs initiated this action on May 5, 2011, alleging breach of contract and seeking declaratory judgment. According to Plaintiffs, they have already expended $6,351,740.07 to investigate and remedy the water inflow, and they estimate that an additional $14,129,527.52 will be required. Plaintiffs also seek a declaratory judgment that Defendant must pay the expenditures for the investigation, evaluation, design, and implementation of remedies for the water inflow problem. Plaintiffs claim that relief is warranted under the Policies all-risk, sue-and-labor, and business interruption provisions.

On August 21, 2012, Defendant moved for summary judgment on the basis that Plaintiffs' claimed loss does not fall within any of the Policy periods, the sue-and-labor provision is inapplicable, and Plaintiffs' claims are precluded by the Policies' exclusions. Defendant also argued that Plaintiffs' claims are untimely under the Policies' notice conditions and contractual suit-limitation provision and that Plaintiffs' claims are barred under the doctrines of fortuity, known-loss, and loss-in-progress. On May 22, 2013, the Court issued its Memorandum and Order (Doc. 156) granting summary judgment in favor of Defendant on the basis that Plaintiffs' claims were barred by the notice conditions in the Policies. The Court declined to address the remaining bases that Defendant argued warranted summary judgment in its favor.

Plaintiffs appealed the Court's Order, and the Tenth Circuit reversed and remanded with instructions to vacate the summary judgment award. On April 3, 2014, the Court vacated its Order. Defendant now moves the Court for a ruling on the remaining bases it asserted in its summary judgment motion.

## II.     Defendant's Motion for Ruling on Its Remaining Summary Judgment Bases

Defendant argues that before the Court conducts a trial on this matter, it should rule on the remaining bases set forth in its summary judgment motion. Defendant claims that its

additional summary judgment bases call for the interpretation of the Policies and the application of undisputed facts to Defendant's defenses such that a ruling on them may dispose of the case and obviate the need for trial. In response, Plaintiffs assert that no summary judgment issues remain because Defendant did not pursue its remaining bases on appeal and the Tenth Circuit did not otherwise affirm the Court's summary judgment award on any of those bases. According to Plaintiffs, there is nothing left for review in this case, and it should be set for trial.

The Court disagrees with Plaintiffs. Plaintiffs presented two issues on appeal—late notice and substantial prejudice—which were the only issues addressed by this Court when it granted summary judgment. Neither Defendant nor the Tenth Circuit reached Defendant's remaining summary judgment bases because they were not addressed by the Court in its summary judgment Order. According to the U.S. Supreme Court, "[i]t is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."[9] Moreover, the Tenth Circuit has made clear that it is a "requirement that an issue be 'presented to, considered [and] decided by the trial court' " to be considered on appeal.[10] Because this Court did not reach Defendant's remaining summary judgment bases in its original order granting summary judgment, Defendant did not consider them in its response to Plaintiffs' appeal brief, and the Tenth Circuit properly did not consider them in its decision. The Court therefore finds that the remaining bases set forth in Defendant's Motion for Summary Judgment are ripe for decision and sets forth its ruling on two of these bases below.

---

[9]    *Singleton v. Wulff*, 428 U.S. 106, 120 (1976).

[10]    *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 721 (10th Cir. 1993) (quoting *Cavic v. Pioneer Astro Indus.*, 825 F.2d 1421, 1425 (10th Cir. 1987)).

## III. Defendant's Motion for Summary Judgment

### A. Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[11] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[12] The movant bears the initial burden of proof, and must show the lack of evidence on an essential element of the claim.[13] If the movant carries this initial burden, the nonmovant that bears the burden of persuasion at trial may not simply rest on its pleading but must instead "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant.[14] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[15] The Court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[16]

### B. Plaintiff's Claims Are Time Barred Pursuant to the Policies.

Defendant argues that summary judgment is appropriate because the suit-limitation provision in the Policies bars Plaintiffs' claims. That provision states:

---

[11]   Fed. R. Civ. P. 56(c).

[12]   *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[13]   *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[14]   *Id*. (citing Fed. R. Civ. P. 56(e)).

[15]   *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[16]   *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

Conditions

12. Suit.        No suit, action, or proceeding for recovery of any claim under this policy shall be sustainable in any court of law or equity unless the same be commenced within twelve (12) months next after discovery by the insured of the occurrence which gives rise to the claim, provided, however, that if by the laws of the State within which this policy is issued such limitation is invalid, then any such claims shall be void unless commenced within the shortest limit of time permitted by the laws of such state.[17]

Before determining whether this provision bars Plaintiffs' claims, the Court must first determine whether it is valid and enforceable under Kansas law.

Kansas law requires an action upon a contract to be brought within five years.[18] However, the Kansas Supreme Court recently looked at the issue of whether the parties may contractually limit the time to file suit.  In *Pfeifer v. Federal Express Corp.*,[19] the plaintiff was a former employee who entered into an employment agreement that required her to file suit within six months of termination from employment.[20]  The plaintiff, however, filed suit fifteen months after she was terminated, alleging that her termination was in retaliation for exercising her rights under the Kansas Workers Compensation Act.[21]  The Kansas Supreme Court held that parties are not prohibited from entering into agreements shortening the statute of limitations period provided by statute.[22]  Ultimately, the court invalidated the suit limitation provision in the employment

---

[17]   Policy, Doc. 139-7, p. 62.

[18]   K.S.A. § 60-511(1) (2012).

[19]   297 Kan. 547, 304 P.3d 1226 (2013).

[20]   *Id*. at 549, 304 P.3d at 1229.

[21]   *Id*.

[22]   *Id*. at 554, 304 P.3d at 1231.

contract because it impaired Kansas's "strongly held public policy interest" of worker's compensation and retaliatory action.[23]

In *Infinity Energy Resources v. St. Paul Fire & Marine Insurance Co.*,[24] the District of Kansas interpreted the Kansas Supreme Court's decision in *Pfeifer* to allow parties to contractually limit the time to file suit, even when the statute of limitations allows for a greater period of time, unless the contract violates an articulated public policy.[25] The Court found that this interpretation comports with previous decisions from the District of Kansas, which have held that Kansas law does not prohibit parties from contractually limiting the timely filing of suits.[26] Specifically, the court in *Infinity* found that a suit limitation provision in a first party insurance contract requiring the insured to file suit "within two years after the date . . . damage occurred to the property" effectively barred the insured's claim because it did not file suit until three years after the damage occurred.[27]

Here, the Policies are not incompatible, irreconcilable, or in opposition with Kansas law or public policy. The workers compensation public policy concerns that were present in *Pfeifer* are not present here. Therefore, the one year limitation provision in the Policies is valid and

---

[23]  *Id*. at 559, 304 P.3d at 1234.

[24]  2013 WL 3792899 (D. Kan. July 19, 2013).

[25]  *Id*. at *7.

[26]  *Id*. at *8 (citing *Sibley v. Sprint Nextel Corp*., 2008 WL 2949564 n.7 (D. Kan. July 30, 2008); *Hahner Foreman & Harness, Inc., v. AMCA Int'l Corp*., 1995 WL 643814, at *2 (D. Kan. Oct. 27, 1995); *Coates v. Metro. Life Ins. Co*., 515 F. Supp. 647, 649 (D. Kan. 1981)).

[27]  *Id*.

enforceable. Plaintiffs were required to bring suit within twelve months of "discovery of the occurrence which gives rise to the claim."[28]

The Policies define the term "occurrence" as "any one loss, disaster, casualty, or series of losses, disasters, or casualties arising out of one event."[29] The Policies do not define the term "loss," "disaster," or "casualty." But, as the Court stated in its previous Memorandum and Order, "[t]he fact that an insurance policy does not define each term within it does not somehow make an undefined term unambiguous; ambiguity arises only if language at issue is subject to two or more reasonable interpretations and its proper meaning uncertain."[30] Black's Law Dictionary defines the term "loss" as "[a]n undesirable outcome of a risk; the disappearance or diminution of value, [usually] in an unexpected or relatively unpredictable way."[31] "Disaster" is defined as "a calamity; a catastrophic emergency."[32] And, "casualty" is defined as a "thing injured, lost, or destroyed."[33]

The undisputed facts show that Plaintiffs discovered the "occurrence" giving rise to the claim on January 18, 2008.[34] At this time, Plaintiffs discovered water inflow at the same place

---

[28]   Policy, Doc. 139-7, p. 62

[29]   Policy, Doc. 139-7, p. 49.

[30]   Memorandum and Order, Doc. 156, p. 11 (citing *Newcap Ins. Co. v. Emp'rs Reinsurance Corp.*, 295 F. Supp. 2d 1229, 1240 (D. Kan. 2003) (citation omitted)).

[31]   BLACK'S LAW DICTIONARY, loss (elec. 9th ed. 2009).

[32]   BLACK'S LAW DICTIONARY, disaster (elec. 9th ed. 2009).

[33]   BLACK'S LAW DICTIONARY, casualty (elec. 9th ed. 2009).

[34]   In its previous Memorandum and Order, the Court analyzed the notice condition, which applied to "every loss, damage, or *occurrence* which may give rise to a claim under this policy." Policy, Doc. 139-7, p. 61 (emphasis added). The Court found that Plaintiffs first learned of an occurrence on January 18, 2008, when they discovered the water inflow problem. The Tenth Circuit did not address this finding in its decision. Although the notice condition differs from the suit limitation provision, the question of when Plaintiffs discovered the "occurrence" applies to both provisions. Therefore, part of the Court's reasoning from its prior Memorandum and Order is applicable and set forth here.

they previously observed abnormally high closure rates.  Upon discovering the water inflow in January 2008, Petersen's speculation from 2005 about how water inflow was a worst-case scenario became an actual concern that catastrophic flooding would result in total loss of the Lyons Mine.  Plaintiffs characterized the January 2008 flooding event as a problem that needed to be fixed immediately, and they immediately retained experts and began initiating remedial measures.

The Court's finding that Plaintiffs first discovered the "occurrence" giving rise to its claim in January 2008 comports with Plaintiffs' characterization of the event.  Plaintiffs' Notice of Loss and Proof of Loss identify the claimed "loss" as the water inflow discovered in January 2008.  And, in their attempt to recover under the Policies sue-and-labor provision, Plaintiffs argue that the water inflow constitutes an event of "loss or damage."  The Policies make no distinction between the meaning of the term "loss" throughout their provisions.  Accordingly, if an event constitutes a "loss" sufficient to invoke the sue-and-labor provision, the same event is sufficient to constitute an "occurrence" and evoke the Policies suit limitation provision.

Furthermore, the Court finds that Plaintiffs' observations and speculations from 2004 and 2005 informed the knowledge that they obtained in 2008.  In 2004 and 2005, Plaintiffs observed abnormally high closure rates at Panels 1 and 2B and speculated about flooding as a result.  When Plaintiffs discovered flooding in the same area, Plaintiffs correlated this problem with the high closure rates observed in 2004 and 2005.  Thus, Plaintiffs' discovery of the water inflow also constituted Plaintiffs' discovery that the abnormally high closure rates were part of the same series of losses, disasters, or casualties.

Plaintiffs argue that they complied with the suit limitation provision because the clock did not begin to run until April 2010 when they discovered the cause of the water inflow.

According to Plaintiffs, the term "occurrence" requires knowledge of both (1) the loss or series of losses, and (2) the causal event out of which it arises. Plaintiffs argue that they are in compliance with the suit limitation provision because the clock began to run in April 2010 and Plaintiffs gave notice to Defendant less than four months later, in July 2010. Furthermore, the clock was equitably tolled until Plaintiffs filed suit on May 5, 2011.

The Court finds that the term "occurrence" does not require knowledge of the causal event out of which the loss arises. Nothing in the definition of the term requires such knowledge. Furthermore, the cases Plaintiffs cite in support of this interpretation are unpersuasive, as they either support a finding that Plaintiffs violated the suit limitation provision or are distinguishable from this case.

Plaintiffs cite *Gaylord v. Nationwide Mutual Insurance Co.*,[35] in which the court found that the suit limitation period began to run when the damage becomes "appreciable."[36] Here, the undisputed facts show that in January 2008 the water inflow was "appreciable" because Plaintiffs immediately retained experts and began initiating remedial measures. Thus, even if the Court applied the standard set forth in *Gaylord*, Plaintiffs still violated the suit limitation provision because they did not file suit within one year of discovering the water inflow.

Plaintiffs also rely on *Parker v. Worcester Insurance Co.*,[37] in which the court held that the suit limitation period began to run from the time the insured's expert advised her that there was a substantial structural flaw in her home.[38] Following *Parker*, Plaintiffs are also in violation

---

[35]   776 F. Supp. 2d 1101 (E.D. Cal. 2011).

[36]   *Id.* at 1114.

[37]   247 F.3d 1 (1st Cir. 2001).

[38]   *Id.* at 5.

of the twelve month suit limitation provision because the clock began to run in January 2008 when they discovered the water inflow. That discovery confirmed that there was a significant problem with the structural integrity of the mine that could result in total loss.

Finally, Plaintiffs cite *Myers v. Cigna Property and Casualty Insurance Co.*,[39] in which the court found that the insured did not violate the suit limitation provision because the twelve month limitation period did not begin to run until the insurer's liability accrued, which was after the insured determined the cause of the loss.[40] The court in *Myers* applied New York law, which regards more generic language—such as policy provisions foreclosing suit a certain period "after loss or damage"—as triggering the limitations period to the time when the claim accrues.[41] The phrase at issue in the insurance policy in *Myers* stated that "with respect to any claim or loss to insured property, any suit against us must be commenced within one year of the date of the loss or damage."[42] Here, however, the suit limitation is much more specific, and therefore, the Court declines to follow New York law holding that a suit limitations provision only begins to run after the cause of the loss is determined and the claim becomes due and payable.

Plaintiffs also argue that the suit limitation provision was tolled from the time they gave Defendant notice to the time they filed suit. Plaintiffs cite to no Kansas authority supporting their position that a court would equitably toll a suit limitation provision in an insurance contract. Furthermore, even if Kansas law did allow such tolling, the suit limitation period in this case would have expired before Plaintiffs' asserted tolling period even began. Here, the undisputed

---

[39] 953 F. Supp. 551 (S.D.N.Y. 1997).

[40] *Id*. at 556.

[41] *Id*. at 555.

[42] *Id*. at 553.

facts show that the twelve month limitation period began to run in January 2008, when Plaintiffs discovered the water inflow into the mine, and expired no later than January 2009. Thus, the Court cannot toll the suit limitation period because it expired more than year before Plaintiffs gave Defendant notice of its claim.

For these reasons, the Court rejects Plaintiffs' argument that it did not violate the suit limitation provision because it did not discover the cause of the water inflow until April 2010. Plaintiffs' discovery on January 18, 2008, triggered the Policies' suit limitation provision. Because Plaintiffs did not file suit before January 18, 2009, their claims are time barred, and the Court grants summary judgment in Defendant's favor.

### C.      The Mine Is Excluded from Coverage under the Policies.

In the alternative, Defendant argues that the Policies' exclusions bar any coverage for the Lyons Mine itself. The Policies contain the following language with regard to what they insure:

> Subject to the terms, conditions and exclusions hereinafter contained, this Policy insures:
> 1.      All real and personal property (including improvements and betterments) and contractors equipment of this Insured or similar property in the Insured's care, custody or control for which the Insured may be held liable against all risks of direct physical loss or damage occurring during the period of this policy as stated in the Schedule and/or Declarations attaching to and forming part of this policy . . . .[43]

The Policies list the following categories of Property that are excluded: "8. Water, land or land values;" and "9. Property while Offshore or situated underground unless otherwise endorsed."[44]

Under Kansas law, the terms of an insurance policy are to be construed according to the following rules of construction:

---

[43]     Policy, Doc. 139-7, p.57.

[44]     Policy, Doc. 139-7, p. 60.

The language of an insurance policy, like any other contract, must, if possible, be construed in such way as to give effect to the intention of the parties. In construing a policy of insurance, a court should consider the instrument as a whole and endeavor to ascertain the intention of the parties from the language used, taking into account the situation of the parties, the nature of the subject matter, and the purpose to be accomplished.

Because the insurer prepares its own contracts, it has a duty to make the meaning clear. If the insurer intends to restrict or limit coverage under the policy, it must use clear and unambiguous language; otherwise, the policy will be liberally construed in favor of the insured. If an insurance policy's language is clear and unambiguous, it must be taken in its plain, ordinary, and popular sense. In such case, there is no need for judicial interpretation or the application of rules of liberal construction. The court shall not make another contract for the parties and must enforce the contract as made.

. . .

Whether a written instrument is ambiguous is a question of law to be decided by the courts. Courts should not strain to create an ambiguity where, in common sense, there is not one. The test in determining whether an insurance contract is ambiguous is not what the insurer intends the language to mean, but what a reasonably prudent insured would understand the language to mean.[45]

As explained below, the Court finds the language of the Policies' exclusions to be clear and unambiguous. Because the Lyons Mine is both "land" and "property situated underground," it is excluded from coverage.

### 1. The "Land" Exclusion

Defendant contends that with regard to any damage or loss that the mine itself has incurred, such loss or damage is excluded under the "land" exclusion. Plaintiffs claim that the mine is not "land" but fail to state what they consider it to be. Regardless, the definition of "mine" set forth in the Mine Safety and Health Act,[46] defines a "coal or other mine" as "(A) *an*

---

[45] *Am. Family Mut. Ins. Co. v. Wilkins*, 285 Kan. 1054, 1058-59, 179 P.3d 1104, 1109-10 (2008) (citing *O'Bryan v. Columbia Ins. Group*, 274 Kan. 572, 575-76, 56 P.3d 789 (2002)).

[46] 30 U.S.C. §§ 801 *et seq.*

*area of land* from which minerals are extracted in nonliquid form . . . and (C) *lands*, excavations, underground passageways, shafts, slopes, tunnels . . ."[47]  This definition supports a finding that the mine is land and thus excluded by the "land" exclusion contained in the policies.

Furthermore, the fact that the Policies insure real property but then exclude "land" from coverage does not create an ambiguity.  In *Horning Wire Corp. v. Home Indemnity Co.*,[48] the Seventh Circuit affirmed summary judgment based on an exclusion in an insurance contract that stated "[i]nsurance shall not apply . . . to land, growing crops and standing timber."[49]  The insured argued that this exclusion created an ambiguity because the insurance contract insured against risk of direct physical loss "to all real property."[50]  The Seventh Circuit disagreed, finding that the two provisions could be read together such that land was excluded from coverage but other real property, such as the buildings, were covered.[51]

Applying the Seventh Circuit's reasoning from *Horning Wire* here, the Court finds that the Policies are not ambiguous even though they cover "real property" but exclude "land" from coverage.  These provisions can be read together such that land is excluded from coverage but other types of real property are covered under the Policies.  Therefore, because the mine is "land," it is excluded from coverage under the Policies.

---

[47]    30 U.S.C. § 802 (emphasis added).

[48]    8 F.3d 587 (7th Cir. 1993).

[49]    *Id*. at 589.

[50]    *Id*. at 589-90.

[51]    *Id*. at 590.

### 2. The "Property Situated Underground" Exclusion

Defendant also argues that the Lyons Mine is excluded from coverage based on the "property situated underground" exclusion because it is located underground and not "otherwise endorsed" under the Policies. In response, Plaintiffs argue that this exclusion does not apply because the mine is an "improvement" or "betterment," which the exclusion does not cover, and that the exclusion only applies to personal property. According to Plaintiffs, the phrases "while offshore" and "situated underground" contain temporal and spatial modifiers that signal that the exclusion only applies to property that is capable of being moved or placed—not fixed real property or improvements.

The Court disagrees with Plaintiffs' construction. The plain language of the exclusion refers to "property" in general. Thus, all property, regardless of whether it is classified as "real" or "personal" or an "improvement" or "betterment," is subject to the exclusion. A court will not make another contract for the parties and will enforce the contract as made.[52] If the parties intended for the exclusion to only apply to specific types of property, then the Policies would have expressly provided as such. The mine is "property situated underground" and is not otherwise endorsed by the Policies. Therefore, this exclusion applies to the mine itself.

### 3. A Reasonably Prudent Insured Would Understand the Language of the Policies Excludes the Mine from Coverage.

Plaintiffs also argue that the mine is not excluded from coverage because a reasonably prudent insured would believe the mine itself is covered property. However, Plaintiffs' evidence does not support this assertion, and in fact, suggests the opposite. Plaintiffs claim that Peter

---

[52]    *Am Family Mut. Ins. Co.*, 285 Kan. at 1059, 179 P.3d at 1109.

Powell, owner of the Lyons Mine, testified that he believed the Policies covered the mine. Powell's testimony states:

> Q. And that you didn't – there was nothing that said the mine has a value of, let's say, 10 million dollars or 15 million dollars or 5 million dollars? There was no–
>
> A. Well, it's—um, it's kind of a peculiar question. But I guess there wasn't a specific line item, but there was totals and understandings of values of property.
>
> Q. Do you have – what – what do you value the mine at itself, not the equipment inside of it, but just the mine?
>
> A. I consider replacement value to be about 80 million dollars. I think it's been appraised by the bank by as much as 45 million dollars.[53]

The Policies have an overall limit of $7.5 million dollars and a real property sublimit of $3,675,239. Powell testified that he valued the mine at eighty million dollars and that it had been appraised at forty-five million dollars. If the mine is covered property, as Plaintiffs' assert, then it would be severely underinsured. In addition, the 2008 Statement of Values referenced in the Policy, which provides values for insured property under the Policy, shows a total value as of April 1, 2007, of $13,513,017.00. However, while the Statement of Values contains entries for various buildings and equipment, it does not contain an entry for the mine itself. This indicates that while the Policies were intended to cover equipment and buildings, they were never intended to cover the mine itself.

The Policies also contain an Occurrence Limit of Liability Endorsement that provides the following:

> 2. The premium for this policy is based on the Statement of Values provided to the Insurer(s) by or on behalf of the Insured and kept on file by the Insurer(s). In the event of loss under the policy, the liability of the Insurer(s) shall be limited to the least of the following:

---

[53] Powell Deposition, Doc. 143-7, p. 7.

a.) The actual adjusted amount of loss, less applicable deductible(s);

b.) As respects each location insured by this Policy, 100 percent of the total combined stated values for all categories of covered property (e.g. building, contents) and other covered exposures (e.g., business income, extra expense, rental loss), shown for that location on the latest statement of values or other documentation on file with the insurer.[54]

This language shows that the premium is based on the values set forth in the Statement of Values and that Defendant's liability is limited to "100 percent of the total combined stated values for all categories of property."[55] There is no stated value for the mine itself, again supporting Defendant's argument that the parties did not intend for the mine to be covered property.

Plaintiffs also claim that the evidence shows that Defendant "paid multiple claims for damage to the mine shafts."[56] But, again, Plaintiffs' cited testimony does not support their assertion. The cited testimony shows that the claims made in 2006 and 2009 were for damage to the skip hoist, which is equipment used to raise and lower items from the surface into the mine, and buckets. The claims were not for damage to the mine itself.

In conclusion, the Court finds the language of the Policies to be unambiguous and that the "land" and "property situated underground" exclusions exclude the mine from coverage. Plaintiffs' claims are barred to the extent they seek to recover for damage to the Lyons Mine itself. To the extent Plaintiffs seek to recover for loss or damage to its equipment or operations,[57] the "land" and "property situated underground" exclusions do not apply.

---

[54] Policy, Doc. 139-7, p. 49.

[55] Policy, Doc. 139-7, p. 49.

[56] Plaintiffs' Memorandum in Opposition to Lexington's Motion for Summary Judgment, Doc. 140, p. 71.

[57] According to the Pretrial Order, Plaintiffs are seeking to recover for loss or damage to more than just the mine itself. It states that Plaintiffs are seeking to recover for "loss or damage to, risk of direct physical loss or

**IT IS THEREFORE ORDERED** that Defendant Lexington Insurance Company's Motion for Ruling on Its Remaining Summary Judgment Bases (Doc. 170) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. 138) is **GRANTED**.

**IT IS SO ORDERED**.

Dated this 27th day of May, 2014.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

damage to, and/or to defend safeguard, preserve, and protect against actual or imminent loss to . . . the Lyons Salt Mine, the other insured property and equipment located at the Lyons Salt Mine, the continued business operations of the Lyons Salt Mine, and all other interests at the Lyons Salt Mine insured under one or more of the Policies." Pretrial Order, Doc. 135, p. 9.